MEMORANDUM OPINION

No. 04-05-00391-CV

IN THE MATTER OF E.C.D., JR., A Minor

From the 73rd Judicial District Court, Bexar County, Texas

Trial Court No. 1991-JUV-01209

Honorable Andy Mireles, Judge Presiding



Opinion by: Phylis J. Speedlin, Justice



Sitting: Sandee Bryan Marion, Justice

 Phylis J. Speedlin, Justice

 Rebecca Simmons, Justice



Delivered and Filed: February 21, 2007



AFFIRMED IN PART; REVERSED AND REMANDED IN PART



 E.C.D., Jr. appeals his adjudication and disposition based on a finding that he committed the offense of murder. We affirm
the portion of the trial court's judgment adjudicating that E.C.D. engaged in delinquent conduct; however, we reverse the
trial court's order of disposition and remand the cause for a new disposition hearing. 

Background

 On the night of September 21, 1991, taxicab driver Curtis Edwards was found dead in his cab. He had been shot once in the
head, and his cab had crashed into a house on Onslow Street. A revolver and a black tennis shoe were recovered from the
cab. Floyd Thomas testified that later that same night, he called EMS when E.C.D., his twelve year-old stepson, arrived
home (1) in a dazed and incoherent state. He was wearing one tennis shoe and a bloody t-shirt and smelled of alcohol. 
E.C.D. was transported to Southeast Baptist Hospital, where he was admitted for a few days. While at the hospital, E.C.D.
made statements to nurses, security guards, and a chaplain that raised suspicion regarding his involvement in Edwards'
murder. Shortly thereafter, the State filed its petition alleging delinquent conduct based on E.C.D.'s commission of
Edwards' murder. At trial, the defense claimed that E.C.D. acted at the direction of Floyd Hardeman, E.C.D.'s uncle and a
convicted felon on parole, who had asked E.C.D. if he wanted to make some money by robbing a taxicab driver. (2) 

 After finding that E.C.D. engaged in delinquent conduct as alleged in the petition, which included a deadly weapon finding,
the jury assessed a 27-year determinate sentence. On March 5, 1992, the trial court rendered judgment on the jury's verdict
and imposed a 27-year determinate sentence, ordering E.C.D. committed to the Texas Youth Commission (TYC) until the
age of 18 years with a transfer to the Texas Department of Criminal Justice (TDCJ) to serve the remainder of his sentence. 
E.C.D. requested, and was granted, an out-of-time appeal. 

Discussion

Confidential Communications Under Rule 505

 E.C.D. first argues that the trial court erred in admitting certain testimony by Charles Pollard, a hospital chaplain who
visited with E.C.D. at Southeast Baptist Hospital. E.C.D. contends that Pollard's testimony was improper because his
statements to Pollard were privileged under Texas Rule of Evidence 505. 

 Preliminary questions of admissibility, including questions concerning the existence of a privilege, are for the trial court. 
See Tex. R. Evid. 104(a); see also McVickers v. State, 874 S.W.2d 662, 664 (Tex. Crim. App. 1993), overruled on other
grounds, Granados v. State, 85 S.W.3d 217 (Tex. Crim. App. 2002). When making a privilege determination, the trial
court is afforded broad discretion. See Welch v. State, 908 S.W.2d 258, 264 (Tex. App.--El Paso 1995, no pet.). We review
the trial court's decision under an abuse of discretion standard, and will reverse a trial court's determination only when "the
trial court applied an erroneous legal standard, or when no reasonable view of the record could support the trial court's
conclusion under the correct law and the facts viewed in the light most favorable to its legal conclusion." Carmona v. State,
947 S.W.2d 661, 664 (Tex. App.--Austin 1997, no pet.) (quoting DuBose v. State, 915 S.W.2d 493, 498 (Tex. Crim. App.
1996)). Should we determine that the trial court abused its discretion in admitting such testimony, we conduct a harm
analysis under Rule 44.2(b). Tex. R. App. P. 44.2(b); Johnson v. State, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001) (the
erroneous admission or exclusion of evidence is not reversible error unless it affects a substantial right of the defendant; a
substantial right is affected when the error has a substantial and injurious effect or influence in determining the jury's
verdict). 

 Rule 505(b) affords a privilege for confidential communications made by a person "to a member of the clergy in the
member's professional character as spiritual adviser." Tex. R. Evid. 505(b); (3) Almendarez v. State, 153 S.W.3d 727, 728
(Tex. App.--Dallas 2005, no pet.). "A communication is 'confidential' if made privately and not intended for further
disclosure except to other persons present in furtherance of the purpose of the communication." Tex. R. Evid.
505(a)(2);Kos v. State, 15 S.W.3d 633, 638-39 (Tex. App.--Dallas 2000, pet. ref'd).

 Pursuant to E.C.D.'s motion in limine, Chaplain Charles Pollard first testified outside the jury's presence. Pollard testified
that on September 24, 1991, he visited with E.C.D. in the hospital after security was called to E.C.D.'s room due to a
disturbance. Pollard assumed that E.C.D. was having "some problems," some of which were "spiritual," and he visited with
E.C.D. as a chaplain "to bring ministry to apparently a very distraught patient in the hospital." Pollard testified that E.C.D.
told him that he would have to go to jail because he "killed a man" and "[w]hen you killed a man, you have to go to jail." 
Pollard continued by stating that E.C.D. told him several different stories about how the shooting happened, but "continued
to come back to the fact that he had pulled the trigger." Pollard stated that there were also nurses in the room while he
visited with E.C.D.; however, on cross-examination, Pollard stated that E.C.D. did not share details about the murder when
the nurses were present. Pollard heard E.C.D. tell the nurses that he would stay in his bed if they could guess a secret
"about something on the news," "[a]bout like something about somebody's been shot." 

 The defense objected to all of Pollard's testimony on the basis of Rule 505. The court initially ruled that, in light of the
testimony of two hospital security officers and two nurses about similar statements made by E.C.D., (4) none of E.C.D.'s
statements to Pollard were made privately, and therefore the statements were not confidential. However, after further
argument from the defense, the court modified its ruling, stating,

 I do think [Rule 505] applies to private conversations with the Chaplain. And I get the sense that [E.C.D.] got a little bit
more specific. What I hear in his testimony is actually - is very specific, when it came to talking to the Chaplain. To me,
there is a difference. And I agree with you. I suppose we'll have to wait until [Pollard] actually testifies to make that
determination ... [I] [w]ill allow the testimony when it's done in the presence of somebody other than the clergyman. If it's
done privately - meaning nobody else in the room, ... the Court will keep that part out.



 In the presence of the jury, Pollard testified similarly; however, his testimony varied from his earlier statements in that he
stated, "[b]est of my recollection, during that time [when the nurses were present], [E.C.D.] said that he had shot the taxi
driver." When the defense asked if he recalled previously "testifying that the only thing E.C.D. did in front of the nurses
was ask about the shooting, ask questions, get them to provide answers," Pollard replied, "I don't really remember the
conversation when the nurses were in there. I don't really remember, because it was so much going on, and my concern was
primarily facilitating the young man, not necessarily who was or wasn't present." The proceedings were then recessed so
the defense could obtain a transcript of the prior statements to impeach Pollard. Later, Pollard was again questioned outside
the jury's presence, and the defense subsequently moved for a mistrial due to the inconsistent testimony. The motion for
mistrial was denied.

 On appeal, E.C.D. argues that the trial court misstated the law when it determined that the Rule 505 privilege only applied
to communications made to Pollard when no one else was present in the room. To support his argument, E.C.D. relies on
Nicholson v. Wittig, in which the court held that Rule 505(a)(2) contemplates that others may be present when confidential
communications are shared with a chaplain, especially in a hospital setting where doctors and nurses routinely enter and exit
patients' rooms. See Nicholson v. Wittig, 832 S.W.2d 681, 685 (Tex. App.--Houston [1st Dist.] 1992, orig. proceeding). 
Although we agree that the trial court read Rule 505 narrowly, we cannot conclude that the trial court abused its discretion
in admitting Pollard's testimony because E.C.D.'s conduct in making similar inculpatory statements to the nurses and
security guards supports the trial court's finding that E.C.D. did not make the statements to Pollard with a reasonable
expectation of confidentiality. See Nicholson, 832 S.W.2d at 685; Kos, 15 S.W.3d at 638-39. The court's ruling was not
beyond the zone of reasonable disagreement. See Montgomery v. State, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990). 

 Moreover, E.C.D. has failed to show that he was harmed by the admission of Pollard's testimony. See Tex. R. App. P.
44.2(b); Johnson, 43 S.W.3d at 4. Four other witnesses testified to similar statements E.C.D. made while in the hospital
that implicated him in the shooting death of Curtis Edwards. Robert Duncan, a security officer at Southeast Baptist
Hospital, testified that on September 24, 1991, he was called to E.C.D.'s room to control him because he would not stay in
bed and was running up and down the hallway. Duncan stated that E.C.D. told him that he was not scared of him and that
he had already killed one person. Linda Garcia, a nurse at Southeast Baptist Hospital, testified that E.C.D. told her that he
would agree to stay in bed if she would tell him about a murder that happened that weekend. Likewise, nurse Karen
Ciomperlik testified that, although she did not hear any of E.C.D.'s conversation with Chaplain Pollard, E.C.D. told her that
he would stay in bed if she would talk about the murders over the weekend. David Henley, a hospital security officer,
testified that E.C.D. told him that he was going to "the pen" when he got out of the hospital. He also stated that E.C.D.
pointed to his weapon and correctly said, "that's a .357 magnum." E.C.D. then commented that he had shot a man, but
Henley did not believe him. E.C.D. replied, "you didn't hear about the cabdriver being shot?" Henley answered that he had
not, and E.C.D. continued by saying that he and his uncle robbed a cabdriver, and that he held the gun to the back of the
cabdriver's head, but that he could not remember anything after the shot. We conclude that Pollard's testimony was
cumulative, and that any error in its admission was harmless. See Franks v. State, 90 S.W.3d 771, 805-06 (Tex. App.--Fort
Worth 2002, no pet.) (where complained of testimony is generally cumulative of other evidence introduced in case, no harm
occurs). E.C.D.'s first issue is overruled. 

Hearsay Exception Under Rule 804

 In his second issue, E.C.D. contends the trial court erred in admitting a statement of the deceased under a hearsay
exception. At trial, the State asked Jack Kelly, Jr., the dispatcher for the cab company, whether he had any post-dispatch
conversations with Edwards on the night of the murder. The defense objected on the basis of hearsay, and the State
countered with an exception under Rule 804(a), arguing that Edwards was unavailable to testify due to his death. See Tex.
R. Evid. 804(a)(4). The trial court overruled the objection, and Kelly continued, stating, "[h]e had told me he picked up at
1622 Burleson and was going to Upland and East Houston." Other evidence established that Floyd Hardeman resided at
1622 Burleson. We review the admission or exclusion of evidence for an abuse of discretion. See McDonald v. State, 179
S.W.3d 571, 576 (Tex. Crim. App. 2005).

 While hearsay is generally inadmissible, an exception to the hearsay rule exists if the declarant is unavailable at the time of
trial, and the statement involves former testimony, dying declarations, or personal or family history. See Tex. R. Evid.
804(a), (b) (emphasis added). The "dying declaration" exception only pertains to statements made by a declarant while
believing his death is imminent, and concerning the cause or circumstances of what he believes to be his impending death.
Tex. R. Evid. 804(b)(2). Although Edwards was clearly unavailable at the time of trial, his statement identifying the
pick-up and drop-off locations does not fall within any of the exceptions listed in Rule 804(b). Therefore, the trial court
erred in admitting the statement. See McDonald, 179 S.W.3d at 576.

 This error, however, is subject to a harm analysis under Rule 44.2 of the Texas Rules of Appellate Procedure. See Tex. R.
App. P. 44.2; see also In re D.V., 955 S.W.2d 379, 380 (Tex. App.--San Antonio 1997, no pet.) (holding that harm in
juvenile appeals from determinate sentences should be analyzed under Rule 44.2). Because the erroneous admission of
hearsay is nonconstitutional error, Moon v. State, 44 S.W.3d 589, 594-95 (Tex. App.--Fort Worth 2001, pet. ref'd), we must
determine whether the error affected E.C.D.'s substantial rights, i.e., whether it had a substantial and injurious effect on the
jury verdict. See Tex. R. App. P. 44.2(b); King v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997); Moore v. State, 55
S.W.3d 652, 661 (Tex. App.--San Antonio 2001, no pet.). 

 E.C.D. does not state how he was harmed by the improper admission of the hearsay. In addition, during the
cross-examination of San Antonio Police Detective Robert Coronado, defense counsel elicited the same evidence when
Coronado testified that during the murder investigation, he learned that a taxicab was dispatched to Floyd Hardeman's
residence at "1621 [sic] Burleson" on the night of Edwards' murder. The erroneous admission of hearsay does not constitute
reversible error if the same facts were proven by other competent evidence introduced without objection. See Lane v. State,
151 S.W.3d 188, 193 (Tex. Crim. App. 2004); see also Thomas v. State, 621 S.W.2d 158, 164 (Tex. Crim. App. [Panel Op.]
1981) (opinion on rehearing). Given that the same testimony was elicited from another witness, we conclude that the
improper admission of the hearsay statement was not harmful to E.C.D. Accordingly, his second issue is overruled. 

Crime Scene Videotape

 In his third issue, E.C.D. argues that the trial court erred in admitting a videotape of the crime scene, which prejudiced him
and denied him a fair trial. We review a trial court's ruling admitting or excluding evidence for an abuse of discretion. 
Montgomery, 810 S.W.2d at 391; Ladd v. State, 3 S.W.3d 547, 569 (Tex. Crim. App. 1999). Rule 403 states that relevant
evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of
the issues, misleading the jury, considerations of undue delay, or needless presentation of cumulative evidence. Tex. R.
Evid. 403; Mozon v. State, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999) (listing criteria for consideration in determining
whether trial court abused its discretion in conducting Rule 403 balancing test); see also Dossett v. State, No.
04-05-00119-CR, 2006 WL 2417142, at *10 (Tex. App.--San Antonio Aug. 23, 2006, pet. filed). Generally, when verbal
testimony describing a matter is admissible, then a photograph or videotape of that same subject matter is also admissible. 
Ramirez v. State, 815 S.W.2d 636, 647 (Tex. Crim. App. 1991); but see Erazo v. State, 144 S.W.3d 487, 489-91 (Tex.
Crim. App. 2004) (noting that certain limits apply to the broad proposition that a photograph is admissible if testimony
describing the subject of the photograph is admissible). In sum, an abuse of discretion arises when the probative value of
the videotape or photograph is small, and its inflammatory potential is great. See Ramirez, 815 S.W.2d at 647; see also
Erazo, 144 S.W.3d at 489 (reviewing court considers the probative value of the evidence, its potential to impress the jury in
some irrational way, the time needed to develop the evidence, and the State's need for the evidence). 

 Here, the State sought to introduce a videotape of the crime scene depicting, among other things, the medical examiner's
initial search of the victim's body. The defense objected that the video was cumulative because nine photographs of the
crime scene were already in evidence, and further objected that it was irrelevant and prejudicial under Rule 403. The trial
court overruled the objections and admitted the video. We do not agree that the video was cumulative of other evidence. A
videotape of a crime scene is not necessarily cumulative of still photographs because the videotape provides a panoramic
view of the scene. Ripkowski v. State, 61 S.W.3d 378, 392 (Tex. Crim. App. 2001). Moreover, Officer Leslie Spiess
testified that the video depicted items not included in the photographs, such as the path that the cab took once it left the
pavement; some blood spatter on the house at 1418 Onslow; a tennis shoe in the driveway at 1418 Onslow; the position of
the body inside the cab and the removal of the body from the cab; and the medical examiner's initial search of the body. 
Furthermore, we cannot say that the video was irrelevant as it was clearly probative of the manner and circumstances of
Edwards' death. See Williams v. State, 82 S.W.3d 557, 563 (Tex. App.--San Antonio 2002, pet. ref'd) (the identification of
the victim and the manner of the victim's death make a videotape of a crime scene relevant in a murder case). Here, the
video depicts nothing more than the reality of the crime committed. Ripkowski, 61 S.W.3d at 392. A trial court does not err
merely because it admits into evidence photographs which are gruesome. Sonnier v. State, 913 S.W.2d 511, 519 (Tex.
Crim. App. 1995). The trial court could have reasonably concluded that the probative value of the videotape was not
substantially outweighed by the danger of unfair prejudice. E.C.D.'s third issue is overruled.













Admonishments Under Section 54.03(b) of the Family Code

 Next, E.C.D. contends that the trial court erred in failing to give him the required admonishments at the beginning of his
adjudication hearing in accordance with section 54.03(b) of the Texas Family Code. (5) Section 54.03(b) provides:

 (b) At the beginning of the adjudication hearing, the juvenile court judge shall explain to the child and his parent, guardian,
or guardian ad litem:

 (1) the allegations made against the child; 

 (2) the nature and possible consequences of the proceedings, including the law relating to the admissibility of the record
of a juvenile court adjudication in a criminal proceeding; 

 (3) the child's privilege against self-incrimination;

 (4) the child's right to trial and to confrontation of witnesses;

 (5) the child's right to representation by an attorney if he is not already represented; and

 (6) the child's right to trial by jury.

Tex. Fam. Code Ann. § 54.03(b) (Vernon Supp. 2006). (6) These admonishments are mandatory. In re C.O.S., 988 S.W.2d
760, 764 (Tex. 1999); In re J.D.C., 917 S.W.2d 385, 386 (Tex. App.--Houston [14th Dist.] 1996, no writ) (explaining
public policy considerations for mandatory admonishments in juvenile proceedings). Additionally, failure to give the
required admonishments is error. In re D.I.B., 988 S.W.2d 753, 755 (Tex. 1999). Errors under section 54.03 are, however,
subject to a harm analysis. Id. at 759; In re C.O.S., 988 S.W2d at 767 (holding statutory rights under section 54.03 are
waivable rights whose violation may be harmless). 

 Specifically, E.C.D. argues that the trial court: (1) wholly failed to admonish him regarding the admissibility of the record
of a juvenile court adjudication in a later criminal proceeding; (2) failed to have his parent present in the courtroom while
the prosecution read the allegations against him; and (3) failed to admonish him as to the meaning or the consequences of a
"deadly weapon" finding. Furthermore, he argues that the other admonishments given to him were inadequately explained.

 We first address E.C.D.'s argument that the trial court erred by not having his mother present in the courtroom while the
prosecution read the allegations against him. The State had already read the petition containing the charges against E.C.D.,
(7) and was beginning to explain the consequences of the proceedings, when the court asked whether E.C.D.'s parents were
present. His mother was then brought in to the courtroom, and the court stated to her: 

 I'm sorry if they held you outside. That was my mistake ... What we're doing here, though, before we bring a jury panel in,
is just making sure that the allegations are on record and that your son knows the nature and the consequences of these
proceedings. ... What the State has done, the State has read the allegations against your son. What he's doing now, he's
telling the Court and all of us the consequences of the proceedings if the allegations are found to be true, okay[?] 



The State then proceeded to explain the possible consequences of the proceeding, including the range of punishment. 
Clearly, the court realized its mistake in failing to have E.C.D.'s mother in the courtroom at the beginning of the
admonishments, but in light of the court's subsequent explanation to E.C.D.'s mother, we cannot say that E.C.D. was
harmed by the fact that his mother was not present when the allegations against him were read. Moreover, E.C.D. does not
state how he was harmed by the absence of his mother during the reading of the allegations, and there is nothing in the
record to suggest that E.C.D., or his mother, did not know or understand the allegations against him. 

 While the State recited the possible consequences of the proceedings, neither it nor the trial court explained the law relating
to the admissibility of E.C.D.'s juvenile record in a later criminal proceeding as required by section 54.03(b)(2). On appeal,
the State concedes that the explanation was not given, but argues that the error was harmless. See In re D.I.B., 988 S.W.2d
at 759 (error under section 54.03(b)(2) is subject to a harm analysis). We agree. With respect to the trial court's failure to
explain the potential use of a juvenile record, harm may be shown by proof that "the juvenile could and would have entered
into a plea agreement with the State based on a lesser offense if he . . . had been properly admonished." In re C.O.S., 988
S.W.2d at 767-68 (explanation under 54.03(b)(2) is required because a judge or jury may consider the range and severity of
the defendant's prior criminal conduct during the punishment phase of a later criminal trial, and "[a]rmed with [that]
knowledge . . . a juvenile might agree to plead true to a lesser offense"). The record here does not reflect any harm to
E.C.D. There is no indication that had E.C.D. been advised that his juvenile record might be used in the future, he could
have avoided an adjudication of delinquency, or could or would have pled true to a lesser offense than murder as the basis
for adjudication. See id. Absent a showing that the trial court's failure to give the required explanation may have affected
the adjudication or the basis for it, the error was harmless. 

 We next turn to E.C.D.'s contention that the trial court erred when it failed to admonish him as to the meaning or
consequences of a "deadly weapon" finding. The reading of the allegations clearly informed E.C.D. that he was accused of
intentionally and knowingly causing the death of Curtis Edwards by shooting him "with a firearm, to-wit: a handgun[.]" 
Section 54.03(b) requires the trial court to explain "the allegations," but does not specifically require that a deadly weapon
allegation, or the consequences of a deadly weapon finding, be separately explained to the juvenile. E.C.D. has cited no
case law in support of his argument that an additional explanation is required. As discussed below, the allegations against
E.C.D. were adequately explained to him, as were the nature and consequences of the proceedings. Accordingly, we cannot
conclude that the trial court erred, or that any error was harmful. See In re C.O.S., 988 S.W.2d at 767-68. 

 Finally, E.C.D. contends the other admonishments were inadequate "to ascertain whether he understood the nature and
gravity of the proceedings, his rights, or the consequences of a finding of delinquency under the determinate sentence
statute" because they were not explained in language that a twelve year-old could understand. The record shows the trial
court informed E.C.D. of his privilege against self-incrimination and explained it as follows: "Essentially what that means
is you don't have

... to say anything to anybody if you don't want to. You understand?" E.C.D. responded in the affirmative, and the court
continued to state, "You can remain silent, and nobody will hold that against you ... If you do talk ..., whatever you say can
be used against you ... You need to talk to your lawyer about how to proceed with that." Next, the trial court explained
E.C.D.'s right to trial and to confront witnesses. E.C.D. answered, "yes, sir," when asked whether he understood these
rights. The trial court also stated that E.C.D. had the right to be represented by an attorney, and asked E.C.D. if he was
satisfied with his lawyer, to which E.C.D. responded, "yes, sir." Finally, the trial court explained that E.C.D. had the right
to a trial by jury, and that the jury would determine his punishment. The trial court asked whether E.C.D. understood
"everything so far that we've said to you," to which E.C.D. replied, "yes, sir." At that point, E.C.D.'s attorney informed the
trial court that while he did not believe E.C.D. was mentally incompetent, E.C.D. did not fully "comprehend on a regular
basis all of the significance of this proceeding ... because of [his] age." The trial court replied, "And no doubt--and the
Court understands the unusual nature of this case, not only in regard to determinative sentencing[,] but [also] the age of the
child . . . [I]f at any point, Mr. Logan, you believe that the Court is not communicating itself in as simplistic a term as
possible, please remind me and I'll do everything that I can to make sure that he understands that, okay[?]" Defense
counsel, however, never asked the trial court to simplify or make additional explanations for E.C.D., and never raised any
further concern about his failure to understand the proceedings and their consequences. Further, the record demonstrates
that E.C.D. fully availed himself of his rights to a jury trial, to avoid self-incrimination, and to confront the witnesses
against him, and received the assistance of an attorney; there is nothing in the record to indicate that he did not understand
his rights; in fact, he acknowledged that he did. Under these facts, we hold that the trial court adequately explained the
matters required by section 54.03(b). Accordingly, E.C.D.'s sixth issue is overruled. 

Jury Charge at Disposition Phase

 In his fifth issue, E.C.D. argues that the trial court erred in refusing to submit his requested jury instruction during the
disposition phase. E.C.D. requested "Special Charge No. 1," which tracked, in part, section 51.01 of the Texas Family
Code as follows:

 Statutes governing juvenile behavior are designed and implemented for the following purposes:

 (1) to provide for the care, the protection, and the wholesome moral, mental, and physical development of children coming
within its provisions;

 (2) to protect the welfare of the community and to control the commission of unlawful acts by children;

 (3) consistent with the protection of the public interest, to remove from children committing unlawful acts the taint of
criminality and the consequences of criminal behavior and to substitute a program of treatment, training, and rehabilitation;

 (4) to achieve the foregoing purposes in a family environment whenever possible, separating the child from his parents only
when necessary for his welfare or in the interest of public safety and when a child is removed from his family, to give him
the care that should be provided by his parents;

 You are instructed to consider these purposes as you deem appropriate in arriving at your verdict.



See Tex. Fam. Code Ann. § 51.01 (Vernon 2002) (current version of statute stating purposes of the Juvenile Justice Code). 
The trial court refused the requested instruction, but allowed E.C.D.'s attorney to read the exact language of the proposed
instruction to the jury during closing arguments at the disposition hearing. E.C.D. argues that he was harmed by the trial
court's refusal to include the requested instruction in the written charge because "the jury failed to apply the governing law
to the evidence presented" and had "no guidance in applying the punishment options presented, and was not properly
instructed on their purpose in disposition." Furthermore, E.C.D. contends that the prosecution's emphasis during closing
argument on punishing E.C.D. by means of incarceration, instead of rehabilitation as mandated by the Family Code, had a
significant and injurious effect on the jury's verdict. 

 We review a trial court's refusal to submit a requested instruction for an abuse of discretion. Louisiana-Pacific Corp. v.
Knighten, 976 S.W.2d 674, 676 (Tex. 1998); In re K.H., No. 12-05-00077-CV, 2006 WL 3211299, at *2 (Tex. App.--Tyler
Nov. 8, 2006, no pet.); In re M.P., 126 S.W.3d 228, 230 (Tex. App.--San Antonio, 2003, no pet.) (the Rules of Civil
Procedure govern juvenile proceedings, unless there is a conflict with the Family Code). No abuse of discretion is shown
unless the requested instruction was so necessary to enable the jury to render a proper verdict that the court's refusal to
include it in the charge probably caused the rendition of an improper verdict. In re K.H., 2006 WL 3211299 at *2; Harris
County v. Bruyneel, 787 S.W.2d 92, 94 (Tex. App.--Houston [14th Dist.] 1990, writ denied). We cannot conclude that the
proposed instruction was necessary for the jury to render a proper verdict on disposition. E.C.D. cites no authority requiring
submission of the requested charge. Furthermore, defense counsel read to the jury the proposed instruction during closing
argument; therefore, the jury was made aware of section 51.01's provisions. Additionally, the prosecutor's comments
concerning the need to incarcerate E.C.D. were a permissible reference to the need to protect the welfare of the community
as contemplated by section 51.01. Accordingly, the trial court did not abuse its discretion in refusing to submit the
requested instruction, and its omission did not cause the rendition of an improper disposition order. E.C.D.'s fifth issue is
overruled.

Missing Reporter's Record of Disposition Hearing

 Finally, E.C.D. argues that he is entitled to a new trial, or at the very least a new disposition hearing, because a significant
portion of the reporter's record of the disposition hearing has been lost or destroyed (8) and is necessary to the resolution of
his appeal. Texas Rule of Appellate Procedure 34.6(f) provides that an appellant is entitled to a new trial if the appellant
timely requested the record, a significant and necessary part of the reporter's record is lost or destroyed through no fault of
his own, and the parties cannot agree to the record. Tex. R. App. P. 34.6(f); Routier v. State, 112 S.W.3d 554, 570 (Tex.
Crim. App. 2003). We abated this case to the trial court to hold a hearing and to make findings concerning the missing
portion of the reporter's record. (9) The trial court made the following findings: the disposition hearing was recorded by a
court reporter on the morning of February 27, 1992; the appellant did not waive his right to have the hearing recorded; the
reporter's record of the February 27, 1992 morning session has not been located and may never have been transcribed; the
reporter's notes have not been located; the missing portion of the record lasted no more than half a day; five witnesses
testified during the morning session of the disposition hearing; (10) all exhibits from the adjudication phase of the trial were
readmitted during the morning session; appellant made a timely request for a complete reporter's record; the missing portion
of the reporter's record was lost through no fault of appellant; and the parties are unable to agree on a complete reporter's
record. The trial court recommended that the appeal proceed in order to determine whether the missing portion of the
reporter's record is material to E.C.D.'s appeal. (11) 

 Having determined that a significant portion of the record is missing through no fault of E.C.D., and that the parties cannot
agree on the record, we must now determine whether the missing portion of the record "is necessary to the appeal's
resolution." Tex. R. App. P. 34.6(f)(3); Alvear v. State, 25 S.W.3d 241, 245 (Tex. App.--San Antonio 2000, no pet.). "The
provision in the rule that the appellant show that the missing portion of the record is necessary to her appeal is itself a harm
analysis." Issac v. State, 989 S.W.2d 754, 757 (Tex. Crim. App. 1999). E.C.D. asserts that the missing portion of the
record is necessary to the resolution of his appeal for three reasons: (1) he cannot adequately brief the issue that the trial
court erred in refusing his proposed jury instruction because the charge conference is missing from the record; (2) he needs
the entire record to brief errors that may have occurred at the disposition phase, such as the admission of extraneous
offenses; and (3) he needs the record to determine whether any evidence supported the trial court's finding that it was in his
best interest to be removed from his home, and that reasonable efforts were made to prevent removal as required by section
54.04(i). See Tex. Fam. Code Ann. § 54.04(i)(1) (Vernon Supp. 2006). 

 We have already addressed the issue regarding charge error and decided that the trial court did not abuse its discretion in
refusing the proposed instruction; therefore, we hold that the missing portion of the reporter's record is not necessary to the
resolution of this matter. Similarly, we hold that the record is not necessary to "brief errors that may have occurred at the
disposition phase." The mere suggestion that errors may have occurred during disposition does not make that portion of the
record necessary to the resolution of the appeal, particularly where that issue is not raised on appeal. See Routier, 112
S.W.3d at 571. E.C.D. does not challenge the length of his sentence on appeal; rather, his only sufficiency challenge is to
the evidence supporting his commitment to TYC. 

 Commitment to TYC

 We do, however, agree with E.C.D. that the missing portion of the reporter's record is necessary to resolve his complaint
that the evidence is insufficient to support the court's finding that it was in his best interest to be placed outside his home
and that reasonable efforts were made to prevent the need for his removal. (12) Section 54.04(i) of the Texas Family Code
provides that when the court commits a child to TYC, it shall include in its order a determination that: (1) it is in the child's
best interests to be placed outside the child's home, and (2) reasonable efforts were made to prevent or eliminate the need
for the child's removal from the home and to make it possible for the child to return to the child's home. Tex. Fam. Code
Ann. § 54.04(i)(1)(A), (B) (Vernon Supp. 2006). (13) Compliance with this procedure is mandatory. See In re J.T.H., 779
S.W.2d 954, 960 (Tex. App.--Austin 1989, no writ); In re A.W., 147 S.W.3d 632, 636 n.1 (Tex. App.--San Antonio 2004,
no pet.). 

 In its disposition order, the trial court recited the required statutory language and found that commitment to TYC was
appropriate for E.C.D. because "any other disposition available to the Court would be inappropriate for the protection of the
community and the safety of the child after considering the serious violent nature of the offense and the child's
demonstrated propensity for antisocial behavior." On appeal, E.C.D. argues that the trial court had no basis for its findings
because there was "no testimony or other evidence in the record, either during the disposition or adjudication phases, that
supports a finding that 'reasonable efforts were made to prevent the need for [his] removal' or that 'it was in [his] best
interest to be placed outside [his] home.'" (14) 

 During the disposition hearing, the jury may not view the social history report, so witness testimony is the only evidence
that may be presented. See Tex. Fam. Code. Ann. § 54.03(d) (Vernon Supp. 2006) (jury may not view social history report
or social service file at any time; court may view report or file after adjudication decision); In re W.M., No.
01-96-00031-CV, 1997 WL 724914, at *2 (Tex. App.--Houston [1st Dist.] Nov. 20, 1997, no pet.) (not designated for
publication). Because the transcript of the morning session of the disposition hearing is lost, there is no testimony from
E.C.D.'s probation officer, or from any other witness, attesting to the need to remove E.C.D. from his home and to the
efforts, if any, made to prevent his removal from the home. In addition, other than the facts pertaining to the underlying
murder offense, there was no testimony that related to these matters during the adjudication phase. See In re M.S.S., No.
04-95-00593-CV, 1996 WL 81926, at *2 (Tex. App.--San Antonio Feb. 28, 1996, no writ) (not designated for publication)
(trial court's disposition findings may be based on evidence from the adjudication hearing). Because the record of the
disposition testimony was not preserved, we have no basis to determine whether there was sufficient evidence to support the
trial court's findings that E.C.D.'s removal was necessary at that time. Therefore, we conclude the missing portion of the
reporter's record is necessary to the resolution of E.C.D.'s issue on appeal, and he is entitled to a new disposition hearing
under Texas Rule of Appellate Procedure 34.6(f). We note that if E.C.D. had received a timely appeal and had raised this
issue concerning the missing record, he would have been entitled to a new disposition hearing. See In re J.S., 993 S.W.2d
370 (Tex. App.--San Antonio 1999, no pet.) (remanding for new disposition hearing where evidence did not support
findings made under section 54.04(i)); In re K.L.C., 972 S.W.2d 203, 206-07 (Tex. App.--Beaumont 1998, no pet.)
(remanding for new disposition hearing where no evidence was introduced that any effort was made to find an alternative to
TYC commitment); In re A.S., 954 S.W.2d 855, 862-63 (Tex. App.--El Paso 1997, no pet.) (remanding for new disposition
hearing where there is no evidence in record to establish that reasonable efforts were made to prevent or eliminate need for
juvenile's removal from the home); In re J.T.H., 779 S.W.2d at 960 (holding that failure to make finding on efforts to keep
juvenile in home requires reversal of disposition order and remand for further proceedings). We realize that due to the
length of time that has passed since the trial court's judgment, E.C.D. is no longer a juvenile and has already been
incarcerated in TDCJ for a lengthy period of time; therefore the juvenile-based issues pertaining to his removal from his
home are no longer relevant. Nevertheless, because the lack of any record supporting the court's findings that removal was
necessary at that time prevents us from conducting a meaningful review of E.C.D.'s appellate complaint, we must reverse
E.C.D.'s disposition order and remand for a new disposition hearing. 

Conclusion

 Based on the foregoing reasons, we affirm the portion of the trial court's judgment adjudicating that E.C.D. engaged in
delinquent conduct, but reverse the order of disposition and remand the cause for a new disposition, i.e., punishment,
hearing. See Tex. Fam. Code Ann. § 56.01(i) (Vernon 2002) (appellate court may remand an order that it reverses for
further proceedings by the juvenile court).

 

 

 Phylis J. Speedlin, Justice



 

1. EMS was dispatched to 419 Dorie Street. San Antonio Police Officer Adrian Miller testified that the distance between
Onslow and Dorie Streets is "probably four miles at the most." It also appears that police officers brought E.C.D. home
because he was found wandering the street, "dazed and incoherent."

2. Floyd Hardeman was also charged with the murder of Curtis Edwards. 

3. Texas Rule of Civil Evidence 505 was in effect in 1992. Because the rule has not changed substantially, all citations are
to the current version of Texas Rule of Evidence 505. 

4. E.C.D.'s statements to the nurses and security guards are summarized below. 

5. E.C.D. did not object to the trial court's failure to properly admonish him under section 54.03(b), but inIn re C.O.S., 988
S.W.2d 760, 763 (Tex. 1999), the Texas Supreme Court held that under the law in effect prior to September 1, 1997, a
juvenile appellant is not required to preserve error in the trial court regarding the explanations required under section
54.03(b) of the Texas Family Code. The State also concedes that E.C.D.'s complaint is properly before this court. 

6. While E.C.D.'s adjudication was governed by section 54.03(b) as it existed before its amendment in 1997, the required
admonishments remain unchanged. In re C.O.S., 988 S.W.2d at 762. Therefore, we cite the current version of section
54.03.

7. Section 54.03(b) states that "the juvenile court judge" shall make the required explanations to the child and his parent. 
See In re K.L.C., 990 S.W.2d 242, 243-44 (Tex. 1999) (trial court's statutory duty to explain to child allegations against him
cannot be delegated to the prosecutor by reading petition in open court). However, such error is not harmful where the
"petition is read at the direction of and in the presence of the trial court and is sufficiently clear and direct to explain the
allegations against the juvenile." Id. at 244. E.C.D. did not raise this particular issue on appeal, and we believe that any
such error was not harmful in this case. See id. 

8. The only portion of the disposition hearing that is included in the record before us contains the court's reading of the
charge, the closing arguments by both attorneys, the reading of the jury verdict, and the entry of judgment by the court. 

9. The abatement hearing was before the Honorable Laura Parker, presiding judge of the 386th Judicial District Court,
Bexar County, Texas. 

10. The trial court found that the five witnesses who testified at the disposition hearing were: "Mr. Vic Tillery, [E.C.D.'s
probation officer], Reverend Brasfield, Mrs. Valentine, Sheila Martinez, and Mr. Born." None of their testimony was
preserved. 

11. Judge Parker also recommended that the appeal proceed "in order to determine whether the missing reporter's record is
lost or destroyed." Given the trial court's fact findings, we conclude that the relevant portion of the record is indeed lost or
destroyed. The State also concedes that the subject portion of the record is lost or destroyed. 

12. This is also E.C.D.'s fourth appellate issue. 

13. The current version of section 54.04(i)(1) also includes subsection (C) (requiring a finding that "the child, in the child's
home, cannot be provided the quality of care and level of support and supervision that the child needs to meet the conditions
of probation"), but the version in effect at the time of E.C.D.'s trial only included subsections (A) and (B). Formerly,
subsection (i) was subsection (g). See In re J.T.H., 779 S.W.2d 954, 959 n.4 (Tex. App.--Austin 1989, no writ) (noting that
subsection (g) has now been renumbered as § 54.04(i)). 

14. The State argues that because the jury sentenced E.C.D. to commitment in TYC, the trial court was not required to
make the findings as to removal under section 54.04(i), and therefore no evidence is necessary to support the findings. The
State's premise is incorrect. Section 54.04(i) requires the trial court to make the necessary findings on removal, even though
the jury has selected the sentence. See Tex. Fam. Code Ann. § 54.04(i) (Vernon Supp. 2006); In re A.W., 147 S.W.3d at
636 n.1; In re J.T.H., 779 S.W.2d at 960; see also Robert O. Dawson, Texas Juvenile Law 435 (6th ed. 2004).